Chief Judge Fuld.
In 1966, a New York County Grand Jury indicted the appellants — four individuals and three corporations — for conspiracy and bribery stemming from a bid-rigging arrangement to prevent competitive bidding on publicly advertised contracts for painting at city housing projects. Involved were painting contractors (the appellants Jerome, Spector and Marcus and their companies, the defendants Campbell, Goldman, Fishbein and Barron as well as Esrig, Graham and Metzger, accomplices not indicted); employees of the New York City Housing Authority (the appellant Wheatman and the defendants Lowell and Nolan); and an official of a painting union (the defendant Rarback). Following a 10-week trial in the New York County Supreme Court, the appellants were convicted of the crimes of conspiracy (under former Penal Law, § 580), of conspiracy to prevent competitive bidding on public contracts (under § 581-a) and of bribery (under § 378).[1]
*18 Upon appeal, the Appellate Division reversed the conviction of the appellants Jerome, Spector and Marcus (and their companies) and ordered a new trial; it was the court’s conclusion that the seizure of certaih documents, received in evidence upon the trial, was illegal because of the insufficiency of the affidavit on which search warrants were issued (33 A D 2d 67). The court affirmed appellant Wheatman’s conviction, concluding that he lacked standing to challenge the validity of the warrants or to question the admissibility of the evidence (34 A D 2d 3 [on reargument]).
On the People’s appeal to our court, we decided that the, affidavit on which the search warrants had been issued was sufficient; accordingly, we reversed the Appellate Division’s order and remitted the case to that court for consideration of the appellants’ points on the merits (29 N Y 2d 337). On Wheatman’s appeal, we withheld determination, believing it desirable to pass upon the merits of his case along with those of the other appellants if, on remand,, the Appellate Division affirmed their convictions. It did affirm (38 A D 2d 801), expressly stating that the arguments made by the six defendants before it were “ without merit ”. We heard the appeals of the seven appellants during our April session.
The appellants seek a reversal of their convictions on a number of grounds, several of which we discuss below.
I. Evidence of Guilt
The People’s case is based on the testimony of several accomplices and is firmly corroborated by copies of documents, prepared and used by the New York City Housing Authority, which were found in the offices of each of the appellant painting, contractors. Since the testimony of the accomplices is somewhat repetitive, we limit ourselves to that of Bsrig, for it was he who, in 1957, played a large part in initiating and developing the conspiracy. He, as well as other contractors, considered the prices paid by the Housing Authority too low to allow for substantial profits. Believing that, if they were to combine and control the bidding, their lot would be far better, he suggested to a number of his fellow craftsmen that they should get together and agree, before placing their bids for any particular job, who *19 was to put in the successful bid. To “ police ” the undertaking, he proposed that they employ the leader of the painting union, Earback, pointing out that he could “ harass ” any member of the combine who “broke the line ” and cause trouble to non-group members who bid and obtained a contract from the Authority. Earback agreed to do the job for 2% of the contract price. More particularly, he undertook to keep those not parties to the conspiracy “ out of the bidding ” and, if any- such contractor “ did bid and was the low bidder, he would harass ” him by insisting on strict compliance with union rules and regulations and by assigning to his projects shop stewards who would see to it that “ the men did as little as possible.”
Esrig also spoke to Wheatman, the head of the Authority’s paint section and his colleague, Lowell. Wheatman and Lowell, it was arranged, were to receive 1% of the contract price in return for providing the conspirators with the Authority’s confidential information, on the basis of which it prepared its own bid estimates. They also agreed to expedite payments to members of the group and to see to it that the Authority inspectors assigned to jobs being performed by such members would be “friendly disposed” to them.
The inside information, which Wheatman prepared, provided a ‘ ‘ complete breakdown ’ ’ of the number of apartments to be painted, the number of ‘ ‘ man-days ’ ’ required to paint them and the “ per diem cost ” of the project. Upon receiving this information, Jerome — who was one of the leaders of the group between 1960 and 1965 — had the'task of revising the estimate figures slightly downward, of retyping such revised figures on Authority “ breakdown ” or estimate sheets and of then distributing them to other members of the group as guidelines in placing their bids. With such information in their hands, the contractors were in a position to tailor their bids to the Authority’s specifications.
Little is to be gained by further detailing the evidence given by the accomplices. As indicated, they described the operations of the conspiracy, the manner in which the bids were arranged and worked out, the bribes paid regularly to Wheatman, Lowell and Earback, the constant harassment by inspectors — of both the Authority and of the union — when outsiders obtained jobs *20 or when a group member fell behind in his bribe payments or bid independently and was awarded the contract. Their testimony is quite convincing, and no basis exists for the appellants’ charge that they were “ unreliable.” In any event, their veracity and credibility were for the jury to assess and, despite the sharp and lengthy cross-examination to which the witnesses were subjected, it is enough to say that the jury believed them.
Contrary to the appellants’ contention, there was, as already mentioned, ample corroboration of the accomplices’ testimony to satisfy the requirements of section 399 of the Code of Criminal Procedure (now CPL 60.22). The independent evidence, we have declared, is sufficient “ if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth.” (People v. Dixon, 231 N. Y. 111, 116; see, also, e.g., People v. Leo, 23 N Y 2d 556, 56(M561; People v. Morhouse, 21 N Y 2d 66, 74.)
As we have already noted, Esrig testified that Wheatman had provided the conspirators with inside information consisting of bid estimates and specifications for the contracts. Corroboration for the testimony against Wheatman is found in his admission to one of the Authority’s security officers, Donald Schatz. He testified that Wheatman told him that he had prepared five copies of bid estimates, instead of the three required for Authority use, and that he had given the two extra copies to Esrig and Campbell, two of the contractors in the conspiracy.[2] Wheatman also told Schatz that he had lied to the grand jurors.
Indisputably corroborating the accomplices’ testimony, not only against Wheatman but against the appellant contractors as well, was the evidence that the police had found copies of the bid estimates and handwritten lists containing the Authority’s estimate figures in the office of each of the appellant contractors. More specifically, the copies of the documents found in the appellant contractors’ offices contained revised estimate figures, written in pencil, which were designed to make certain that the bids filed did not too closely duplicate the estimates *21 prepared by the Authority. Moreover, the papers which Esrig received from Jerome confirmed and corroborated the farmer’s testimony that it was the appellant Jerome who had retyped the documents and revised the estimate figures: the peculiar sort of script on the sheet indicated that it Was from a typewriter in Jerome’s office.
In short, comparison of the documents, introduced in evidence and submitted to the jury for inspection, demonstrates that Jerome obtained carbon copies of the bid estimates which Wheatman had prepared, that he passed the information he received, along with his revised estimates, on to the other appellants who relied upon such information in filing their bids.
II. Court’s Charge as to Feldman’s Status
Graham, one of the accomplices not indicted, had become a member of the conspiracy in 1960. Sidney Feldman, who was Graham’s brother-in-law, joined his firm in June of 1961. He testified that, just “ being broken into the painting business ”, he drove Graham, and the latter’s partner Barron, to several meetings attended by other group members. Prior to going to one of these meetings, he heard Graham “ object ” to Barron’s insistence that their firm had to join “ the group Graham said, according to Feldman, that “ [h]e was doing business [and] did not need this group.” Feldman also testified that he once saw Graham pay money to the defendant Nolan, the Authority’s inspector who had told Graham not to bid on jobs without the group’s approval and that, on two occasions, at Graham’s direction, he himself paid money to Nolan. Concerning the latter payments, Feldman indicated that he made them solely because his employer directed him to do soI was told to do it,” he asserted, “ and that was it.”
The trial judge instructed the jury that Esrig, Graham and Metzger were accomplices as a matter of law but refused to give a similar instruction with respect to Feldman. Instead, he left Feldman’s status to the jurors as a question of fact, telling them that, if they found that he ‘ ‘ knowingly participated in the * * * conspiracy * * * and intended to further [its] objectives ”, then, Feldman was to be treated as an accomplice but that, if they found that he was “ a mere messenger or con *22 duit ” for his employer, then, they could- conclude that he was not an accomplice.[3]
The instructions given by the court were correct. A witness may be stamped as an accomplice only if there is “ a showing that [he] took part in the preparation or perpetration of the crime with the intent to assist therein [cases cited], or that the witness counseled, induced or encouraged the crime [case cited] ” (People v. White, 26 N Y 2d 276, 278), for, as we held more than 40 years ago, ‘ ‘ The generally accepted test as to whether a witness is an accomplice is whether he himself could have been convicted * * * either as principal or accessory * * * The question of intent must always enter as an element of the crime.” (People v. Jackerson, 247 N. Y. 36, 42; see, also, People v. Clougher, 246 N. Y. 106, 110-111; People v. Crossman, 241 N. Y. 138, 145-146; People v. Swersky, 216 N. Y. 471, 475-477; People v. Sweeney, 213 N. Y. 37, 44, 47; Ann., Accomplices — Question of Law or Fact?, 19 ALR 2d 1352,. 1374.) This court’s holding in the Sweeney case (213 N. Y. 37, supra), in which the defendants were tried for the crime of conspiracy, is particularly pertinent. There, the wife of one of the accomplices (Thomas Walsh) paid money to one Hartigan so that he might pass it on to another accomplice (Fox). In upholding the trial judge’s refusal to charge that Mrs. Walsh was an accomplice as a matter of law, the court wrote (p. 47):
“ It does not appear, at least as a question of law, that Mrs. Walsh had guilty knowledge of the alleged conspiracy. *23 She had some knowledge of the relations between her husband and Fox. She knew that Fox, as a member of the police force, had collected graft for her husband as a captain in said force, but she testified that her procurement of $150 and the delivery thereof to one Hartigan, to which she also testified, were at her husband’s direction and from his money, and she repeatedly testified that she had no knowledge of what was ultimately to be done with the money. It does not clearly appear that she had knowledge that it was to be used for an unlawful purpose. The evidence was far from being sufficient to connect her as a principal in the crime charged in the indictment.”
Since, in the case before us, the facts adduced upon the trial left Feldman’s intent in doubt and his status as accomplice inconclusive, the trial judge very properly left the issue to the jury.[4]
III. Other Contentions
The appellants also urge that they were prejudiced (1) by evidence that some of the witnesses had been assaulted or threatened and (2) by the prosecutor’s action in calling a witness— one Piccirillo — who, before taking the stand, announced in the jury’s presence that he would not testify.
Based on the evidence, the jury was warranted in finding that the conspiracy charged against the appellants involved acts of harassment and intimidation of outsiders who had the temerity to bid on Housing Authority proposals. In other words, there was ample basis for concluding that the assaults testified to were arranged and inflicted in furtherance of the conspiracy. Accordingly, evidence of such conduct was clearly admissible against all the conspirators. (See, e.g., People v. Fiore, 12 N Y *24 2d 188, 200; People v. Luciano, 277 N. Y. .348, 358; People v. Connolly, 253 N. Y. 330, 340.)
Piccirillo had previously testified before a Kings County Grand Jury that he and another had assaulted Graham— indeed, had pleaded guilty to such an assault — and the New York County District Attorney expected and hoped that he would give similar testimony to the trial jury in this case. However, when he was called as a witness, he refused to take the stand and, in the presence of the jury, stated: “ I know nothing about the case. I don’t .want to take the stand. I have nothing to say ’ ’. He was then excused. The trial judge immediately instructed the jury that “ [t]he situation that just occurred * * * is evidence of nothing * * * You are to disregard, [it] completely.” The appellants could not possibly have been harmed by this incident. The jurors had no idea of the testimony which the prosecutor expected from the witness or any knowledge of Piccirillo’s connection with the case. All they knew was what he said, namely, that he knew nothing about the case. There was not the slightest intimation that his refusal to testify was based on his privilege against self incrimination, nor was there any basis for the fear that the jurors might have inferred from his conduct that any testimony he was going to give would have inculpated the defendants on trial. People v. Pollock (21 N Y 2d 206, 212), upon which the appellants rely, presented an entirely different situation.
Likewise without substance is the appellants’ argument that the Supreme Court’s decision in Bruton v. United States (391 U. S. 123) rendered inadmissible Wheatman’s statement to Schatz, the Authority’s security officer, that he had prepared two extra copies of the agency’s estimates and had lied to the grand jury when he testified that he had prepared only three. The court in Bruton decided that a defendant’s confession or admission may not be received in evidence if it implicates his codefendants. (See People v. Jackson, 22 N Y 2d 446, 450.) However, and this the appellants overlook, the rule laid down in Bruton does not apply to a case in which the challenged statement, such as the one before us, does not incriminate any of the declarant’s codefendants. (See, e.g., People v. Wallace, 13 Cal. App. 3d 608, 618; State v. Gibson, 3 Wn. App. 596, 601.)
*25 We have considered the other contentions advanced by the appellants and find them so lacking on merit as not to require discussion.
In each case, the order appealed from should be affirmed.
Judges Burke, Scileppi, Bergan, Breitel, Jasen and Gibson concur.
In each case: Order affirmed.

. Of the other defendants, we note that Campbell pleaded guilty before trial; that, as to Fishbein, Barron, Nolan and Rarback, the jury failed to reach a verdict; and Goldman and Lowell were not tried, the court having directed a severance.

. Wheatman’s secretary and another Authority employee, Cooke, confirmed that for years Wheatman had made two extra copies of the bid estimates.

. The charge on this subject, insofar as relevant, reads as follows:
“If you find from the evidence that Feldman knowingly participated in the alleged conspiracy to rig bids and bribe public officials and intended to further the objectives of the conspiracy, you may come to the conclusion as a factual matter, that Feldman is an accomplice.
“ Should you come to that conclusion as a matter of fact, then Feldman’s testimony is accomplice testimony, and it may not be used to corroborate any other witness, but his testimony must be corroborated in accordance with the rules of law which I explained to you.
“ However, if you come to the conclusion that Feldman was a mere messenger or conduit for his employer, in such instance you may come to the conclusion that he was not an accomplice as a matter of fact. Should you reach that determination, then his testimony may be used as corroboration, if believed by you, as independent evidence which may tend to connect a defendant or defendants with the crime charged.’’

. Feldman expressly testified that he paid the bribe money to Nolan only because he was told to do so by Graham. Moreover, it appears that Feldman had overheard Graham assert that he “objected” to joining the group and that “he did not need this group." This being so, the jury might well have found that Feldman believed, if he gave any thought to the matter, that the payments which Graham dire'cted him to make were not for the purpose of advancing or promoting the bid rigging but were, on the contrary, the price which Nolan exacted for not taking retributive action against Graham as an outsider who had succeeded in obtaining contracts independently of the group. In that event, quite obviously, the payments would not have been in furtherance of the conspiracy charged in the indictment.