(January 30, 1992)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LAWRENCE GERENSTEIN, Appellant.—Harvey, J.

At some point in the early months of 1988, defendant first approached his friend Michael Harden, an ex-convict, about a

scheme to murder defendant's ex-wife, Kathleen Gerenstein, in return for $5,000 or $10,000. According to Harden, he initially assumed these requests were nothing more than jokes and he laughed them off. However, as the new year progressed, defendant's requests became more urgent. Apparently defendant was very concerned about an upcoming April 1989 property settlement hearing which he feared would be unfavorable to him. In early February 1989, after another conversation with defendant, Harden went to the police and told them about defendant's scheme. Sensing that they did not believe him, however, Harden left the station.

Nevertheless, on the evening of February 14, 1989, Harden asked a friend to drop him off at Gerenstein's home. When Gerenstein answered the door, Harden showed her his identification and told her that it was a matter of the utmost urgency and that she had to listen to him. He told Gerenstein that defendant had approached him about killing her in exchange for money. Harden relayed that defendant had not only described Gerenstein's daily schedule and the layout of Gerenstein's home in detail, but had told him where the wall safe was in her home in order to make the murder look like it happened in the course of a robbery. Defendant told Harden not to murder Gerenstein in front of their 16-year-old daughter so as not to "traumatize" her. Harden told Gerenstein that it was especially urgent that she be warned now since he was afraid that defendant had approached two other men about the plan to kill Gerenstein, apparently because he was impatient with Harden's stalling. After Harden and Gerenstein talked for awhile, Gerenstein tried to call her attorney for advice but he was not at home. Harden phoned defendant at his home to show Gerenstein that he was telling the truth. Gerenstein listened briefly and recognized defendant's voice. Harden then requested that Gerenstein accompany him to the police barracks so they could tell the story together, but Gerenstein refused.

The next day Harden contacted Gerenstein's attorney, who told Harden to call the District Attorney. The District Attorney's office referred Harden to the State Police, who immediately launched an investigation in cooperation with the Sheriff's Department. Harden was instructed to attempt to engage defendant in conversation so that his plot to murder Gerenstein could be recorded on tape. Subsequently, Harden placed two phone calls to defendant and had two other conversations with defendant while wearing a body wire. During the first recorded call on February 15, 1989, defendant was very em-

phatic in that he would not talk to Harden over the phone or in front of anyone and ended the conversation. The next day, Harden entered defendant's store and told defendant that he had seen his daughter. The conversation then went as follows:

"Defendant: Why did you meet my daughter? When did * * *

"Harden: I went down there to the house.

"Defendant: Was she alone?

"Harden: I went down there and * * *

"Defendant: So you met my daughter—what did you do to her?

"Harden: Sh sh sh.

"Defendant: What did you do what did you do?

"Harden: Be cool with you man. Not with your daughter there.

"Defendant: All right.

"Harden: Because you had told me before—so let us try and spare her the trauma.

"Defendant: Uh huh.

"Harden: Okay and that's that.

"Defendant: We're talking too much. When the job is done come and see me I don't want to hear it I don't want to discuss it."

Thereafter Harden asked defendant for $100. When defendant refused, Harden asked for a gun. Defendant refused again and said "[t]hen don't use a gun. * * * A blade and that's what I would do. I wouldn't use a gun or I wouldn't leave the knife. I would do the job or I would use a rope and cut her head off. But you don't have to listen to me. You do it your way. But I don't want to talk about it no more."

On the morning of February 17, 1989, the police arranged a simulated crime scene at Gerenstein's home and instructed Harden to phone defendant at work and tell him that the murder was done and that he wanted his money. Harden called and told defendant that it was over and done with. In response to questioning by defendant, Harden indicated that he had done the job that morning which explained why it was not yet in the newspapers. Harden told defendant that his "daughter wasn't there" and defendant responded "thank God". In the course of the conversation, defendant repeatedly stated that he needed proof that the job was done before he would pay Harden. Harden responded that "the woman is dead, she's thru". Defendant told Harden to lay low and wait.

Later that morning, Harden was wired and given a chain and ring belonging to Gerenstein and an identification card bearing Gerenstein's photograph; he was then sent back to defendant's place of business. During this last conversation, Harden showed the items to defendant and defendant told Harden that he should destroy the chain and burn the identification card. Defendant told Harden not to worry and that he would pay him. Defendant also told Harden that he did not want to know any details of the crime so that he would be able to pass a lie detector test. After further conversation, defendant gave Harden $60 and Harden left the store.

Thereafter, defendant was arrested and subsequently indicted for the crimes of conspiracy in the second degree and criminal solicitation in the second degree. At trial, Harden and Gerenstein testified for the People as did two of the police officers who conducted the investigation. Additionally, an audio engineer and another witness testified as to the preparation and transcribing of the audiotapes. Defendant was the only witness testifying for the defense and he basically denied that there had been a conspiracy or plan to murder Gerenstein. He indicated that it was all a misunderstanding and implied that Harden was unstable and that defendant spoke as he did on the tapes simply to humor him. Thereafter, the jury found defendant guilty of both counts of the indictment and he was sentenced to concurrent prison terms of 8½ to 25 years for the conspiracy charge and 2⅓ to 7 years for the criminal solicitation charge. This appeal followed.

We affirm. Initially, defendant argues that County Court erred in failing to charge the jury that Harden was defendant's accomplice and, therefore, that his testimony required corroboration (see, CPL 60.22). As pointed out by the People, however, defendant did not request an accomplice charge, which omission constitutes a waiver of his right to contest that issue on appeal (CPL 470.05 [2]; see, e.g., People v Cordilione, 159 AD2d 864, 867, lv denied 76 NY2d 786; People v Nelson, 144 AD2d 714, 716, lv denied 73 NY2d 894). Moreover, we are disinclined upon reviewing all the evidence to reverse defendant's conviction as a matter of discretion in the interest of justice. There can be little question that Harden was not defendant's accomplice as a matter of law since such a finding is only appropriate where the "undisputed evidence establishes that a witness is an accomplice" (People v Basch, 36 NY2d 154, 157). As for the question of whether Harden's status as an accomplice was a factual issue that should have been submitted to the jury to determine, we must note that

the evidence at trial does not support such a conclusion other than through the use of sheer speculation. Harden testified consistently that he never had any intention to kill Gerenstein and, at first, thought defendant was joking about the whole thing. When he realized that defendant was serious he went to the police and Gerenstein on his own to tell the whole story. The testimony from Gerenstein and the police officers does not contradict this story and it is notable that there is no evidence whatsoever that Harden committed an act in furtherance of the crime or that the police ever considered charging him with any crime. This conclusion is not altered by the fact that Harden admitted on cross-examination that one of his motivations in warning Gerenstein was to get back at defendant for not paying him some money he said defendant owed him from an unrelated transaction. While a jury could have inferred from this admission that Harden was lying about the story to get revenge, this admission does not in any respect establish that Harden was an accomplice. A witness may be stamped as an accomplice only if it is shown that the witness " 'took part in the preparation or perpetration of the crime with the intent to assist therein * * * or that the witness counseled, induced or encouraged the crime' " (People v Wheatman, 31 NY2d 12, 22, cert denied sub nom. Marcus v New York, 409 US 1027, quoting People v White, 26 NY2d 276, 278). The question of intent is of paramount importance and the normal test to determine accomplice status is whether the witness could also have been convicted, either as a principal or accessory (People v Wheatman, supra, at 22). Since there was no proof at trial that would establish any of these factors with respect to Harden, we decline to hold that County Court abused its discretion in not giving an accomplice charge.[1]

Defendant's remaining contentions have been examined and found to be without merit. Looking at the totality of the circumstances, we disagree that defendant was deprived of the effective assistance of counsel (see, People v Gross, 171 AD2d 957, 958; People v Cordilione, supra). Contrary to defendant's arguments, his conspiracy conviction was supported by sufficient evidence. Harden's testimony as well as the taped conversations provided ample proof that defendant intended that

---

1. Parenthetically, we note that even if the jury could permissibly speculate that Harden was in fact an accomplice, the evidence contained in the tape-recorded conversations and the testimony from the investigating officers provided more than ample corroboration of Harden's story (see, People v Weaver, 157 AD2d 983, 985-986, lv denied 76 NY2d 744).

Gerenstein be killed and that there was an illicit agreement to that effect *(see,* Penal Law § 105.15).[2] As for the requirement that there be the commission of an "overt act" by defendant in furtherance of the conspiracy (Penal Law § 105.20), this requirement was fulfilled by, *inter alia,* defendant's description to Harden of Gerenstein's schedule and car along with the location and layout of her home *(see, People v Lancaster,* 158 AD2d 311, 312, *lv denied* 76 NY2d 738; *see also, People v Weaver,* 157 AD2d 983, 984-985, *lv denied* 76 NY2d 744). Finally, we are unpersuaded by defendant's contention that his sentence was harsh and excessive. Although County Court imposed the harshest sentences authorized, we cannot say that it abused its discretion in light of the cold-blooded and calculated nature of the crimes for which the jury convicted him. The proof at trial was sufficiently compelling and we note that defendant at no point showed any signs of remorse.

Mercure, Mahoney and Casey, JJ., concur. Ordered that the judgment is affirmed.

---

2. The fact that Harden did not possess the intent or was acting as a police informant at the time the agreement was made does not obviate the fact that the required agreement was made *(see,* Donnino, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law art 105, at 391-392).