**Eric GLISSON, Petitioner,**

**v.**

**Dominic MANTELLO, Superintendant, Coxsackie Correctional Facility, Respondent.**

**No. 00 Civ. 4773(VM).**

United States District Court, S.D. New York.

Oct. 15, 2003.

Eric Glisson, Romulus, NY, Pro se.

### DECISION AND ORDER

MARRERO, District Judge.

Pro se petitioner Eric Glisson ("Glisson"), incarcerated at Five Points Correctional Facility ("Five Points"), seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He claims that his state court convictions in New York State Supreme Court, Bronx County (the "Trial Court") on two counts of Murder in the Second Degree violated his rights under the United States Constitution because: (1) his counsel's opening statement and efforts to cross-examine the prosecution's main eyewitness were interrupted and curtailed by rulings from the Trial Court; (2) the Trial Court improperly admitted a confession by a non-testifying co-defendant; (3) the Trial Court improperly allowed evidence of uncharged crimes; (4) the Trial Court refused to give a negative inference charge regarding certain ballistics evidence or impose sanctions for certain *Brady* violations; (5) he was arrested inside his home without a warrant and certain statements he made subsequent to this arrest were improperly admitted into evidence; and (6) his conviction was against the weight and sufficiency of the evidence. The State of New York (the "State") filed an opposition on behalf of respondent Dominic Mantello, who was the Superintendent of Coxsackie Correctional Facility, where Glisson was incarcerated when he first filed his habeas petition.

The Court referred the case to Magistrate Judge Frank Maas and on July 2, 2003, he issued a Report and Recommendation (the "Report"), recommending that the writ be denied for reasons more fully explained below. The Report is attached and incorporated hereto. On August 13, 2003, Glisson filed objections to the Report, asserting, among other things, that: (1) his Confrontation Clause claim was not procedurally defaulted; (2) the Report's reliance on *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), to uphold the introduction of Glisson's non-testifying co-defendant led to an incorrect decision; (3) the Report incorrectly assessed the significance of the introduction of evidence of uncharged crimes; (4) the

Report incorrectly analyzed Glisson's claims of prosecutorial violations pursuant to the doctrine articulated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (5) Glisson's alleged statement to the police following his purportedly illegal arrest should have been suppressed; (6) Glisson's claim that he was denied the right to present a full opening argument had been properly exhausted; and (7) the Report could not have reached a fair conclusion regarding the sufficiency of the evidence because the Magistrate Judge did not have access to the entire trial transcript. The State did not file any objections to the Report. For the reasons discussed below, the Court denies Glisson's writ of habeas corpus.

## I. FACTUAL DISCUSSION AND STATE PROCEEDINGS [1]

Glisson was convicted in September 1997 in the Trial Court on two counts of Murder in the Second Degree (Penal Law §§ 125.25[1] and [3] ). The evidence presented at Glisson's trial (the "Trial") convinced the jury that around 4:00 a.m. on January 19, 1995, Glisson was involved in the robbery of Baithe Diop ("Diop"), a driver for the New Harlem Cab Company, and fired the fatal shot that killed Diop.

The State presented several witnesses to establish Glisson's guilt, including one eyewitness, Miriam Taveras ("Taveras"), a former acquaintance and love interest of Glisson, who testified that she watched from her bathroom when Glisson fired the shot that killed Diop. Glisson's principal defense witness was Jose Rojas Tolentino ("Tolentino"), an inmate at Sing Sing Correctional Facility who testified that he had robbed and killed Diop with four other

individuals, and that Glisson had not been involved.

After his conviction, Glisson appealed to the New York Supreme Court, Appellate Division, First Department (the "Appellate Division"), which affirmed his conviction. *See People v. Glisson*, 260 A.D.2d 245, 689 N.Y.S.2d 38 (1st Dep't 1999). On May 24, 1999, the New York State Court of Appeals denied Glisson's application for leave to appeal. *See People v. Glisson*, 93 N.Y.2d 1002, 695 N.Y.S.2d 748, 717 N.E.2d 1085 (1999).

After a series of subsequent state court filings, Glisson filed a habeas petition with this Court on June 28, 2000, which was amended on August 10, 2000. Glisson later filed an affidavit on January 22, 2001 to withdraw the petition in order to exhaust certain state claims, then subsequently submitted a petition to reopen the habeas proceeding on November 30, 2001 and a motion requesting leave to re-file his petition on April 7, 2003.

## II. DISCUSSION

### A. STANDARD OF REVIEW

The Federal Magistrate Act provides that a district judge may "designate a magistrate to conduct hearings, including evidentiary hearings" in order to "submit to a judge of the court proposed findings of fact and recommendations for the disposition . . . of applications for post-trial relief made by individuals convicted of criminal offenses. . . ." 28 U.S.C. § 636(b)(1)(B) (2000). In reviewing the Report, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.; see also* Fed.R.Civ.P. 72(b). Any party may object to the Magistrate

---

**1.** Because of the Report's exhaustive discussion of both the facts of this case and the subsequent procedural history, (*see* Report at 2–19), the Court conducts a brief discussion of only the factual background and procedural history.

Judge's findings and recommendations. *See* 28 U.S.C. § 636(b)(1). If any objections are timely filed, as is the case here, the Court is bound to make a *"de novo* determination of those portions of the report ... or recommendations to which objection is made." *Id.; see also United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997).

Having conducted a careful *de novo* review of the Magistrate Judge's well-reasoned Report, and of the objections filed by Glisson, the Court denies the petition essentially on the basis of the reasoning and authorities supporting the findings and recommendation of the Report.

### B. OBJECTION # 1: UNEXHAUSTED CLAIM

■ A federal district court may examine claims raised in a petition for a writ of habeas corpus only if the petitioner has first "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Specifically, a habeas petitioner must have "fairly presented" the claims that are raised in the habeas petition in state court by offering both the factual and legal premises of his claims to the highest court of the state. *Picard,* 404 U.S. at 275, 92 S.Ct. 509; *see also Duncan v. Henry,* 513 U.S. 364, 365–66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995). Moreover, the habeas petitioner must present to the state court the constitutional nature of all such claims so that the state court is fairly alerted to the particular constitutional concerns involved. *See Daye v. Attorney General of New York,* 696 F.2d 186, 194 (2d Cir.1982) (en banc), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984); *Orraca v. Walker,* 53 F.Supp.2d 605, 608 n. 2 (S.D.N.Y.1999).

Here, one of Glisson's habeas petition claims was that the Trial Court improperly curtailed his counsel's opening statement, first by instructing defense counsel *sua sponte* in front of the jury at the opening of the statement that counsel could not discuss the specifics of Taveras's prior statement to the police because the Trial Court had not yet ruled on the statement's admissibility, then by cautioning defense counsel in front of the jury near the end of the opening statement that he was "going outside the scope of an opening statement."

■ The Report found that this claim was never properly exhausted because it was not raised in federal constitutional terms on direct appeal, and although Glisson sought to dismiss his original habeas petition in order to exhaust the claim, he never actually did. Glisson responds that he never received this Court's memo endorsement, dated January 25, 2001, dismissing Glisson's petition without prejudice to enable Glisson to exhaust all unexhausted claims in state court, and therefore he was unaware of his obligation to return to state court to exhaust the claim and consequently never did so. Glisson argues, however, that his prior citation to *People v. Crimmins,* 36 N.Y.2d 230, 367 N.Y.S.2d 213, 326 N.E.2d 787 (1975) in his state court briefs was sufficient to place the state court on notice that they were to consider federal constitutional issues with regard to the claim.

The Court acknowledges the possibility that Glisson was not made aware of his obligation to exhaust until nine months after the Court dismissed the petition, when he received a letter from Magistrate Judge Maas, dated November 9, 2001. Indeed, Glisson attaches to his Affidavit in Support of Objection, dated August 13, 2003, a letter to Glisson from Five Points's First Deputy Superintendent John K. Hoxie, dated April 3, 2002, stating that Glisson did not receive any legal corre-

spondence during the months of January and February of 2001—which is when the Court mailed its dismissal order to Glisson—at the correctional facility at which he was then housed.

However, even assuming Glisson was not informed of the dismissal of his habeas petition, the Court concurs with the Report's finding that Glisson's brief reference in his state court briefs to *Crimmins*—a New York Court of Appeals case that did not discuss the proper scope of an opening statement—to set forth New York's harmless error standard did not give the Appellate Division any notice that a federal constitutional issue was being raised regarding the Trial Court's interruption of defense counsel's opening statement. Thus, Glisson did not exhaust this claim, and despite having seventeen months between first being made aware of the dismissal of the habeas petition and his filing a motion to refile the habeas petition, Glisson never did exhaust the claim. Indeed, Glisson's first action upon discovering the Court had dismissed his claim in accordance with his request was to file to re-open the habeas petition, rather than pursue exhaustion of the claim. As a result, the Court agrees with the Report that this claim should be dismissed for want of exhaustion.[2]

## C. *OBJECTION #2: PROCEDURALLY BARRED CLAIM*

 Even when a habeas petitioner "fairly presents" his claims before the state courts, federal habeas review is prohibited if a state court rests its judgment on an "adequate and independent state ground." *Harris v. Reed*, 489 U.S. 255, 261–62, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). A state procedural default qualifies as an adequate and independent ground unless the petitioner shows "cause for the default and prejudice resulting therefrom." *Gonzalez v. Sullivan*, 934 F.2d 419, 421 (2d Cir.1991) (citations omitted). When a claim is procedurally barred in this way, a petitioner cannot obtain federal habeas corpus review of the merits of the claim "unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris*, 489 U.S. at 262, 109 S.Ct. 1038 (citations omitted; internal quotations omitted); *see also Wainwright v. Sykes*, 433 U.S. 72, 84–85, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

In his brief to the Appellate Division, Glisson contended that the Trial Court unduly limited cross-examination of the eyewitness regarding her acknowledged bias against Glisson, thereby violating his right to confrontation. The Appellate Division found that this claim had not been preserved at trial, and consequently declined to review it. *See Glisson*, 689 N.Y.S.2d at 39. The Appellate Division also noted that if it were to review the

---

**2.** The Court also concurs with the Report's observation that were Glisson permitted to return to state court, his claim would be barred from collateral review because "the failure to have raised the claim on direct review ... forecloses further collateral review in [New York] state court." *Jones v. Keane*, 329 F.3d 290, 296 (2d Cir.2003); *see also Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir.2000) ("New York permits only one application for direct review, and having failed to raise the claim on direct appeal [the petitioner] may not seek collateral relief in New York courts.") (citations omitted). Furthermore, the Court agrees that with the Report's observation that Glisson's claim of a constitutional violation because of the Trial Court's interruptions of defense counsel's opening statement is without merit. (*See* Report, at 28 n. 8.)

claim, it "would find that the [Trial Court] accorded ample scope of cross-examination on this subject." *Id.*

Under New York's contemporaneous objection rule, questions of law can only be preserved for appellate review if "a protest ... was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." N.Y.Crim. Proc. Law § 470.05 (McKinney 1994). The Second Circuit has consistently held that failure to object at trial in accordance with this rule constitutes an adequate and independent state ground to dismiss a claim. *See, e.g., Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990). Thus, the Court agrees with the Report that this claim is procedurally defaulted.

As previously mentioned, the United States Supreme Court has established two exceptions to such procedural defaults whereby a habeas court can still review a procedurally defaulted claim. With regard to the first exception, a petitioner must show both cause for the default and actual prejudice as a result of the error. *See Wainwright,* 433 U.S. at 87, 97 S.Ct. 2497. With regard to the second exception, a procedural default can be overlooked if there has been a "fundamental miscarriage of justice." *Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

■ The Supreme Court has defined a showing of cause as "some objective factor external to the defense" which explains petitioner's failure to comply with the procedural rule, such as ineffective assistance of counsel. *Id.* at 488, 106 S.Ct. 2639. Prejudice is established by showing that "the constitutional errors raised in the petition actually and substantially disadvantaged [petitioner's] defense so that he was denied fundamental fairness." *Id.* at 494, 106 S.Ct. 2639. Moreover, "mere possibility of actual prejudice resulting from an error at trial is not enough." *Wainwright,* 433 U.S. at 91, 97 S.Ct. 2497. The Court agrees with the Report that Glisson has failed to establish any cause for his failure to contemporaneously object to the Trial Court's limitations on defense counsel's cross-examination. Consequently, the Court need not even consider the issue of actual prejudice.

■ As for the second exception, Glisson fails to show that there has been a "fundamental miscarriage of justice," which the United States Supreme Court has explained must be shown "by clear and convincing evidence that but for a constitutional error, no reasonable juror would, have found the petitioner [guilty]." *Sawyer v. Whitley,* 505 U.S. 333, 335, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). The Court agrees with the Report that Glisson has neither presented such evidence, nor is it possible, even accepting his allegation as true, that such purported constitutional errors alone would have caused a reasonable juror to find Glisson guilty. Thus, the Court concurs with the Report's conclusion that the Court lacks jurisdiction to consider this claim.[3]

---

**3.** The Court notes that despite the Report's finding that this claim was procedurally defaulted, the Report proceeds to discuss the merits of this purported constitutional violation, and finds that defense counsel was able to engage in a thorough cross-examination that fills more than 200 pages of the trial transcript. (*See* Report at 29–31.) In light of this extensive cross-examination, the Report concludes that the Trial Court's limits on further questioning of Taveras was not an abuse of the considerable discretion such court retains over trial proceedings, and that *even if* Taveras should have been allowed to answer such questioning, such error in not permitting

### D. OBJECTION # 3: CO–DEFEN-DANT'S STATEMENT

■ During the Trial, Detective Michael Donnelly ("Donnelly") testified that, while being questioned in a interrogation room in the 43rd Police Precinct, co-defendant Michael Cosme [4] ("Cosme") told the police: "Yeah, right, I did that motherfucker." (Trial Transcript ("Tr."), at 776.) Donnelly also testified that immediately following that statement, Glisson, who was being detained in a nearby holding cell, shouted: "Yo, Mike, shut up, they ain't got shit." (*Id.*) Glisson contends that the admission of Cosme's statement confessing to the crime violated Glisson's Sixth Amendment Right under the Confrontation Clause "to be confronted with the witnesses against him." U.S. Const. amend. V. To support this claim, Glisson cites *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), where the Supreme Court held that even if the jury was instructed to disregard a non-testifying co-defendant's confession implicating the accused insofar as the jury's consideration of the accused's guilt was concerned, such a confession was not admissible. *See id.* at 135–6, 88 S.Ct. 1620.

The Court agrees with the Report that Cosme's statement was properly admitted at the Trial. The *Bruton* doctrine does not apply because the statement by itself did not implicate Glisson at all. *See People v. Wheatman,* 31 N.Y.2d 12, 334 N.Y.S.2d 842, 851, 286 N.E.2d 234 (1972) ("[T]he rule laid down in *Bruton* does not apply to a case in which the challenged statement ... does not incriminate any of the declarant's codefendants."). Instead, the statement provides context for the introduction of Glisson's statement, which was properly admitted into evidence. In-deed, without Cosme's statement, Glisson's response would be so vague as to render it unhelpful to the jury, and therefore Cosme's statement was important to provide the necessary context for Glisson's outburst. Consequently, as the Trial Court instructed the jury both immediately after the testimony and in the final jury charge, the statement was not offered for the truth of its content, but rather to explain Glisson's subsequent action. *See People v. Jordan,* 201 A.D.2d 961, 607 N.Y.S.2d 828, 828 (4th Dep't 1994) (allowing third-person testimony into evidence that when man walked by defendant and co-defendant, "the co-defendant said that was the person they had shot, and that both defendant and co-defendant thereupon 'ducked down' ").

### E. OBJECTION # 4: UNCHARGED DRUG CRIMES

■ During the Trial, Lieutenant Sean O'Toole ("O'Toole") testified that, when Glisson was arrested, "[t]here was garbage strewn all over the apartment, crack vials, marijuana, bags in the apartment." (Tr., at 652.) Defense counsel asked to approach the bench immediately after this testimony, and, following an off-the-record sidebar discussion, the Trial Court instructed the jury to disregard any reference to the items O'Toole had observed in the apartment. Glisson argues that such testimony was highly prejudicial and a mistrial should have been granted. The Court disagrees.

■ As the Report noted, courts "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it." *Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). For

---

the questioning was harmless. (*See id.* at 31.) The Court concurs with this assessment.

**4.** Cosme was tried separately from Glisson.

O'Toole's utterance to constitute a constitutional wrong, Glisson must demonstrate both (1) that it is "overwhelming[ly] probab[le]" that the jury will be unable to follow the instruction, *Richardson v. Marsh,* 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), and (2) that the effect of the evidence would have a strong likelihood of being "devastating" to the defendant. *Bruton,* 391 U.S. at 136, 88 S.Ct. 1620.

Glisson fails to make a showing on either element. The statement constituted two lines in a transcript containing over a thousand pages, *see Dickens v. Herbert,* No. 00 CIV. 3249, 2002 WL 1728514, at *5 (S.D.N.Y. July 25, 2002) (noting that the challenged testimony "took up a single line of trial transcript, followed by the testimony of 14 other witnesses"), and the instruction, given almost immediately following the statement, was easy to understand and follow. *See United States v. Paone,* 782 F.2d 386, 395 (2d Cir.1986) (noting that "the jury was not asked to perform olympian mental gymnastics" in considering curative instruction). Thus, Glisson's case does not present a situation where it is overwhelmingly probable that the jury could not follow the Trial Court's instructions. *See United States v. Castano,* 999 F.2d 615, 618 (2d Cir.1993) (holding that the inadvertent admission of two items of evidence regarding weapons did not violate defendant's rights because the court ordered that the admission be stricken); *Roldan v. Artuz,* 78 F.Supp.2d 260 (S.D.N.Y.2000) (holding that even if testimony produced inadmissible evidence of uncharged crimes, the trial court's prompt curative instructions to the jury eliminated the risk of unfair prejudice). Moreover, the Court is not persuaded that such inadvertent testimony had any effect on the jury's conviction of Glisson, much less a "devastating" one.

## F. *OBJECTION # 5: BRADY VIOLATIONS*

■ The State's obligation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) is to disclose evidence favorable to the defense which is material to either guilt or punishment. To establish a violation of the *Brady* doctrine, Glisson must demonstrate: 1) that the evidence in question was favorable to the accused, either because it is exculpatory or impeaching; 2) that the evidence was suppressed by the government, either willfully or inadvertently; and 3) that prejudice ensued, *i.e.,* there was a reasonable probability that the outcome would have been different had the evidence not been suppressed. *See Strickler v. Greene,* 527 U.S. 263, 280–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

■ Glisson claims there were two separate *Brady* violations during the Trial. First, Glisson contends that the Trial Court erred when it denied his request for an adverse inference charge with respect to certain bullets recovered from Diop's body, which were unavailable at the Trial because they had been stolen during a prior proceeding. Glisson argues that the existence of these bullets was relevant to his defense because Tolentino testified that he had killed Diop using a gun containing blue bullets, and thus establishing the fact that at least one of the bullets was blue could bolster Tolentino's testimony. However, the color of the bullets was known to the defense before the Trial, and was an uncontested fact. Thus, the Court agrees with the Report that the existence of the bullets would not have served as exculpatory or impeachment evidence from which Glisson could have benefited.

■ Second, Glisson contests the Trial Court's ruling that the telephone records linked to Diop's cellular phone—which

were not turned over to the defense until they were mentioned by Donnelly under cross-examination—were not *Brady* material. Glisson argues that these records were favorable to the defense and could have been exculpatory because they showed phone calls to a compatriot of Cosme, but not to any friends or family members of Glisson. The Trial Court ruled that the telephone records did not tend to exculpate Glisson, and the Report agreed with this conclusion.

The Court concurs as well. Such evidence proves nothing regarding Glisson's involvement in the crime charged because even if the cellular phone was only used by Cosme, such a fact would not exclude Glisson as a defendant. Moreover, it is just as likely that Glisson possessed the phone but decided not to use it, or had no reason to use it to contact friends or family, as it is that the lack of such use exonerates Glisson. Thus, the Court is not persuaded that the telephone records were favorable to Glisson in a way that required the invocation of *Brady*.

### G. OBJECTION # 6: SUPPRESSION OF GLISSON'S STATEMENT

Glisson also argues that he was arrested without a warrant in his home and that his subsequent statement at the police station should have been suppressed pursuant to *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). A Fourth Amendment claim arising from a state criminal conviction is barred from federal habeas corpus review unless the state courts denied the petitioner a full and fair opportunity to litigate the claim. *See Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). As a result, a federal court is not permitted to judge the merits of the state court's decision, but instead must evaluate only whether the state court's procedure for resolving Fourth Amendment claims is "facially adequate," and determine that no "unconscionable breakdown" of the process occurred in the petitioner's case. *Capellan v. Riley,* 975 F.2d 67, 71 (2d Cir.1992). An unconscionable breakdown occurs when the state court fails to conduct a reasoned inquiry into the petitioner's claim. *See Papile v. Hernandez,* 697 F.Supp. 626, 633 (E.D.N.Y.1988).

Federal courts have approved New York's procedure for litigating Fourth Amendment claims—a process embodied in N.Y.Crim. Proc. Law § 710.10 *et seq.* ("§ 710.10") (McKinney 1995)—as being facially adequate. *See Capellan,* 975 F.2d at 70 n. 1. Therefore, "federal scrutiny of [petitioner's] Fourth Amendment claim[ ] is not warranted unless he demonstrates that he was in fact precluded from utilizing [that procedure] by an unconscionable breakdown in the review process." *Shaw v. Scully,* 654 F.Supp. 859, 863–64 (S.D.N.Y.1987).

In the instant case, Glisson availed himself of the procedures set forth in § 710.10, and the state court conducted a reasoned inquiry into the relevant questions of facts and law. Over several days prior to the Trial, a state court held a pretrial hearing (the "Hearing") where Donnelly and Detective Joseph Sanderson testified as to the circumstances surrounding Glisson's arrest, and were subject to cross-examination. Glisson also testified and was cross-examined. Based on this testimony and other evidence introduced at the Hearing, the judge presiding over the Hearing ruled that the arrest was valid. Such a procedure reflects a "reasoned inquiry" into Glisson's claims, and as a result, the Court is persuaded that Glisson was not the victim of an unconscionable breakdown in state procedure and that his Fourth Amendment claim is unreviewable

by this Court. *See Ortiz v. Artuz,* 113 F.Supp.2d 327, 336 (E.D.N.Y.2000).

## H. *OBJECTION # 7: WEIGHT AND SUFFICIENCY OF THE EVIDENCE*

■■■ Glisson finally contends that the jury's verdict of guilty was against the weight of the evidence presented during the Trial. The Second Circuit has held that a "state prisoner 'is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *Einaugler v. Supreme Court of the State of New York,* 109 F.3d 836, 839 (2d Cir.1997) (quoting *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *accord Farrington v. Senkowski,* 214 F.3d 237, 240–241 (2d Cir.2000); *Rukaj v. Fischer,* No. 02 Civ. 3529, 2003 WL 194201, at *3 (S.D.N.Y. Jan. 28, 2003). Moreover, the Court must consider "the evidence in the light most favorable to the prosecution." *Ponnapula v. Spitzer,* 297 F.3d 172, 176 (2d Cir.2002). Thus, on the matter of the sufficiency of the evidence, Glisson has a heavy burden and must "rebut[ ] the presumption that all factual determinations made by the state court were correct." *Id.; see also* 28 U.S.C. § 2254(e).

After reviewing the evidence presented at the Trial in the light most favorable to the prosecution, the Court is not persuaded that Glisson can meet this rigorous burden. While the Court agrees with the Report's observation that both Taveras's and Tolentino's testimony are imperfect, the Court also acknowledges that in analyzing a sufficiency of the evidence claim, the Second Circuit has held that a court must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's

choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998) (citation omitted).

Indeed, one of the sacred tenets of jury trials is that determinations of witness credibility "are within the sole province of the jury." *Hayes v. New York City Dept. of Corr.,* 84 F.3d 614, 619 (2d Cir.1996); *see also Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and [are] not grounds for reversal on appeal"). If Tolentino's testimony had been withheld or suppressed from the jury's consideration, then the Court would be concerned about the sufficiency of the conviction. Instead, the jurors were able to watch Tolentino testify before them and judge his credibility for themselves. Likewise, the jury had the opportunity to hear directly from Taveras, and either credit or discount her testimony. The jury obviously chose to believe Taveras over Tolentino, which is not a conscience-shocking decision considering Tolentino's constant confusion over certain key facts, such as who robbed the livery car with him, his recent extended stays in psychiatric hospitals because he heard voices telling him to kill himself or others, his use of certain medications for his psychiatric condition, and his admission that he had "trouble distinguishing between what was real and what was not real." (Tr. at 1191.) It is not the role of the Court to interfere in such credibility determinations by the jury.

In addition, while the Court acknowledges that the transcripts of the Trial as provided to the Court and the Magistrate Judge are incomplete because they do not contain any portions of the Trial after the close of the defense's case, the Court concurs with the Report that the transcript portions provided, along with the state

court briefs filed on appeal, are sufficient to resolve the issues raised in the habeas petition, in particular because none of Glisson's claims or objections directly refer to the portions of the Trial contained in the missing section.

### III. *CONCLUSION AND ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that Glisson's petition for a writ of habeas corpus is DENIED.

The Clerk of Court is directed to close this case.

### SO ORDERED.

### REPORT AND RECOMMENDATION TO THE HONORABLE VICTOR MARRERO

MAAS, United States Magistrate Judge.

### I. *Introduction*

Petitioner Eric Glisson brings this *pro se* habeas corpus proceeding, pursuant to 28 U.S.C. § 2254, to challenge his conviction following a jury trial, in Supreme Court, Bronx County, on two counts of Murder in the Second Degree, in violation of Sections 125.25(1) and (3) of the New York Penal Law.[1] (*See* Am. Pet. ¶ 4). On October 28, 1997, Acting Justice Robert Straus sentenced Glisson to concurrent terms of twenty-five years to life. (*Id.*).

Glisson's petition raises six grounds for relief. His first five claims allege that the trial court erred by (i) curtailing his counsel's opening statement and cross-examination of the prosecution's key eyewitness; (ii) allowing his co-defendant's confession

to come before the jury; (iii) failing to grant a mistrial based upon testimony regarding uncharged drug crimes; (iv) failing to give an adverse inference charge and impose sanctions for alleged *Brady* violations; and (v) denying a pretrial motion to suppress his allegedly inculpatory statement. (*Id.* at 3, 6, 8, 10, 15). Glisson's final claim is that his conviction was contrary to the weight and sufficiency of the evidence. (*Id.* at 18).

For the reasons that follow, Glisson's petition should be denied. Additionally, pursuant to 28 U.S.C. § 2253(c)(2), Glisson should be denied a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right.

### II. *Background*

#### A. *Relevant Facts*

#### 1. *People's Case*

The People's proof at trial established that on the morning of January 19, 1995, at approximately 3:50 a.m., co-defendant Cathy Watkins telephoned the New Harlem Car Service to request a livery car. (Tr. 678–79, 681). On prior occasions, Watkins had used the alias "Yvette" and had asked to be picked up at 30 West 141st Street in upper Manhattan. (*Id.* at 681, 684). That night, Watkins requested that a car pick her up at her usual location and take her to Rosedale and Randall Avenues in the Bronx. (*Id.* at 683). The dispatcher instructed Car Number 92, driven by Baithe Diop, to respond and told "Yvette" to wait outside for the car.[2] (*Id.* at 684–86).

---

1. Glisson filed both an original and an amended petition. (Docket Nos. 1–2). Both allege substantially the same claims.

2. Watkins was tried together with Glisson. She received a sentence of twenty-five years

to life following her conviction of Murder in the Second Degree. (*See* Affidavit of Assistant District Attorney Nancy D. Killian, sworn to on Nov. 30, 2000 ("Killian Aff."), Ex. 2 (Resp't's Br.) at 4 n. 1).

At 4:30 a.m., while feeding her infant granddaughter in her living room, Johnetta Lyons observed a white car moving very slowly along Croes Avenue in the direction of Lafayette Avenue.[3] (*Id.* at 197–98, 207). Lyons testified that she saw and heard a "bump," followed by the voice of a man pleading "Please, don't shoot me," and then another "bump." (*Id.* at 198–99, 207–08, 210–11). After the second "bump," she saw somebody running from the car. (*Id.* at 198). At first, Lyons characterized both bumps as gunshots; she later indicated, however, that the first bump might have been the sound of a car crash. (*Id.* at 208, 211–12).

At approximately the same time, while Miriam Taveras was smoking a cigarette outside her house, she saw a white taxi cab on Lafayette Avenue. (*Id.* at 323–24). About five minutes later, as she was returning inside, Taveras observed the car on Croes Avenue. (*Id.* at 324). From her bathroom window, Taveras saw four people leaving the car: three men known to her as "Skloo," Michael "Mike" Cosme, and "Kojak," and a woman whom she later identified as Watkins. (*Id.* at 324–26, 330). As he was exiting the car, Skloo whistled to Glisson who ran over from a nearby park. (*Id.* at 328, 335–36). After Glisson entered the front passenger side of the car, Taveras heard Kojak say "hurry" and "kill him." (*Id.* at 336). She then saw Cosme fire a shot in a downward direction at the driver, followed by the flash from his gun. (*Id.* at 337). Taveras heard the victim screaming and, shortly thereafter, saw Glisson fire a second shot at the driver. (*Id.* at 339–40). Glisson, who had been struggling with something in the car, then ran away with the others. (*Id.*). As

they fled the scene, Taveras noticed Cosme carrying a gray object, and Glisson carrying what she thought was a car radio. (*Id.* at 341).

Firefighter James Brennan, Police Officer John Crisalli, and Detective Curtis Harris responded to the scene, where they observed a dead body slumped over the steering wheel of the car. (*Id.* at 36, 40–41, 104–07, 225–26, 231). They testified that the area was well lit by regular as well as halogen streetlights. (*Id.* at 38–39, 42, 56, 118–19, 229).

Dr. Josette Montas performed an autopsy on Diop's corpse, recovering two bullets: one from the thigh and the other from the junction of the skull and spine. (*Id.* at 625, 628, 630).

In the course of the homicide investigation, the police instructed the car service dispatcher to have "Yvette" taken to the nearest police precinct if she called again for a car. (*Id.* at 748). As a consequence, on January 21, 1995, Watkins was taken to the 28th Precinct, where a dispatcher identified her voice as that of "Yvette." (*Id.* at 690–91, 759–62). Less than two weeks later, on February 3, 1995, Glisson and Cosme were arrested.[4] (*Id.* at 645–46, 651–52). While they were at a police precinct on the day of their arrest, Glisson made a statement which the prosecution contended was an acknowledgment of his guilt. (*Id.* at 774–76).

### 2. *Defense Case*

Glisson's principal defense witness was Jose Rojas Tolentino ("Tolentino"), who was serving time in the Sing Sing Correctional Facility for a prior cab robbery.

---

**3.** The Court can take judicial notice that this location is approximately four blocks from the destination that Watkins gave the dispatcher when she called for the car. *See* Fed.R.Evid. 201(b).

**4.** Watkins was arrested shortly thereafter. (*Id.* at 783).

(*Id.* at 1149, 1151). After he was granted immunity at the request of the prosecutor, Tolentino testified that he was in a pizza parlor on January 19, 1995, at approximately four in the morning. (*Id.* at 1152, 1157). While there, he, "Mike" (Cosme), "B–Love," "Snoop," and a man named Darien called a cab to take them to Rosedale Avenue. (*Id.* at 1157–59, 1162, 1164). At defense counsel's prompting, Tolentino corrected himself and indicated that "Snoop" was actually "Skloo." (*Id.* at 1157).

Tolentino testified further that he and B–Love shot the cab driver, after which B–Love took a "walkie-talkie" radio and some money from the cab and the group fled. (*Id.* at 1157–58, 1168, 1183).

It was not surprising that the jury rejected Tolentino's testimony. Among other things, Tolentino at first testified that the Diop robbery occurred "[i]n the middle" of the year, then that it occurred "late" in the year, and, finally, that he could not recall the time of the year. (*Id.* at 1173–74). Tolentino also could not remember where Skloo or B–Love lived. (*Id.* at 1173–74, 1188). When he was shown pictures of some of the participants in the robbery, he also "mixed up" their names. (*Id.* 1186–87, 1213). Tolentino further testified that he had spent three out of the last five years in psychiatric hospitals because he heard voices telling him to kill himself or others. (*Id.* at 1190–91). During these hospital stays he was treated with various medications, including Haldol and Tuinal, and had trouble distinguishing "what was real and what was not real." (*Id.* at 1191).

### B. *Subsequent Procedural History*

Following his conviction, Glisson appealed to the Appellate Division, First Department, on the same grounds asserted in his habeas petition. (*See* Killian Aff., Ex. 1

(Def.'s Br.) at 2). On April 15, 1999, the Appellate Division, First Department, unanimously affirmed Glisson's conviction. *See People v. Glisson,* 260 A.D.2d 245, 689 N.Y.S.2d 38 (1st Dep't 1999). In its decision, the Appellate Division found that "[t]he verdict was based on legally sufficient evidence and was not against the weight of the evidence." *Id.* at 39. The court further concluded that the trial judge had properly denied Glisson's suppression motion because he was not arrested in his home and his statement "was not in response to any form of police questioning." *Id.*

The Appellate Division further held that the trial judge had properly curtailed portions of defense counsel's opening statement which "constituted argument more appropriate in closing." *Id.* The court also determined that the trial judge had properly exercised his discretion by denying Glisson's application for a mistrial based upon testimony by a police officer which was stricken and the subject of an "immediate" curative instruction. *Id.*

The court found that Cosme's statement at the precinct was properly admitted because it "did not incriminate [Glisson] on its face" and "was necessary to explain [Glisson's] own statement." *Id.*

Finally, the court concluded that Glisson had not properly preserved his claim that the trial judge had denied him his right to confront his accusers by unduly limiting the cross-examination of Taveras regarding her bias against Glisson. *Id.* The court also noted that if it were to review this claim, it "would find that the court accorded ample scope of cross-examination on this subject." *Id.*

On May 24, 1999, the New York Court of Appeals summarily denied Glisson's application for leave to appeal. *People v. Glisson,* 93 N.Y.2d 924, 693 N.Y.S.2d 508,

715 N.E.2d 511 (1999). On July 6, 1999, the court denied Glisson's motion for reargument or reconsideration of this decision. *People v. Glisson,* 93 N.Y.2d 1002, 695 N.Y.S.2d 748, 717 N.E.2d 1085 (1999). Thereafter, on September 9, 1999, the Appellate Division denied another motion by Glisson seeking reargument or reconsideration of its decision affirming his conviction. (Killian Aff., Ex. 6).

On or about June 15, 1998, while his direct appeal was underway, Glisson filed a motion to set aside his conviction, pursuant to Section 440.10 of the New York Criminal Procedure Law ("Crim.Proc.L."). (*Id.,* Ex. 7). Justice Straus denied this motion on May 7, 1999, and, on October 26, 1999, the Appellate Division, First Department denied Glisson's application for leave to appeal from that denial. (*Id.,* Exs. 9–10).

Glisson's original habeas corpus petition is dated May 8, 2000, was received by the Pro Se Office of this Court on May 22, and was filed on June 28, 2000. (*See* Docket No. 1). Glisson's amended petition, dated July 30, 2000, was received by the Pro Se Office on August 10, 2000, and filed the same day. (*See* Docket No. 2).

The Respondent's papers in opposition to Glisson's amended petition alleged that several of his claims were unexhausted. After receiving those papers, on January 5, 2001, Glisson asked to withdraw his petition so that he could exhaust the unexhausted claims in state court. (*See* Docket No. 9 (Affidavit of Eric Glisson, sworn to on Jan. 5, 2001)). Shortly thereafter, Your Honor granted this request by memorandum endorsement, and this proceeding was dismissed without prejudice. (*See id.*). Due to Glisson's transfers to and from various correctional facilities, he apparently first learned of this dismissal when he received an October 22, 2001 letter from my Chambers informing him of Your Hon-

or's decision. (*See* Docket No. – (Petition to Reopen, dated Nov. 19, 2001, ¶¶ 3–4)).

On November 19, 2001, Glisson submitted a petition to reopen this habeas proceeding. (*Id.*). Before this petition could be addressed, Glisson filed a second set of papers seeking to have this proceeding reopened. (Docket No. 18 (Motion to Reopen, dated June 11, 2002)). The Government opposed both requests, contending that any reinstated petition would be untimely. (Docket Nos. 14 (Killian Aff. in Resp. to Appl. to Reopen Pet., sworn to on Dec. 6, 2001)), 19 (Killian Aff. in Resp. to Second Appl. to Reopen Pet., sworn to on June 20, 2002). On April 7, 2003, Glisson filed a motion requesting leave to re-file his petition. (Docket No. 30).

### C. *Alleged Errors at Trial*

#### 1. *Right to Confront Accusers*

Glisson alleges that his Sixth Amendment right to confront his accusers was violated in two different ways during the trial. (Am. Pet. at 3–6).

The first alleged error is based on the trial court's two interruptions of his defense counsel's opening statement. (Tr. 30–31, 33). The first instance occurred at the very start of the opening statement when the judge instructed defense counsel *sua sponte* that he could not discuss the specifics of Taveras' prior statement to the police because there had not yet been a ruling regarding its admissibility. (Tr. 30–31). The second *sua sponte* interruption resulted in the judge cautioning defense counsel that he was "going outside the scope of an opening statement." (*Id.* at 33).

Glisson also complains that during Taveras' cross-examination, his defense counsel was barred from (a) "eliciting whether there was a (male) or (female) translator" who took notes and recorded her state-

ment; (b) questioning Taveras about any facts omitted when her statement was recorded and the length of her conversation with a police detective; and (c) exposing Taveras' bias against Glisson. (Am. Pet. at 4–5).

In connection with the first two proposed areas of inquiry, Taveras was questioned during cross-examination as follows:

Q. Now, were you speaking in English or Spanish to Detective Donnelly?

A. There was a translator there.

Q. Who was the translator?

A. I don't know his name, like I said, but I know he is a police officer or detective.

Q. So it was – there was first a male translator, you're saying?

A. Yes, at first there was a male who was –

Q. Did this male translator take down any notes of what you had told him? Did you see that?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

Q. Did you see if this male translator was recording what statements you made?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

. . . . .

Q. How long did you speak with Detective Nievas, if you can recall?

MR. MCCARTHY: Objection.

THE COURT: How long? Sustained.

Q. Do you recall how much time that you spent talking with Detective Nievas?

MR. MCCARTHY: Same question, same objection.

THE COURT: Sustained.

Q. What was the time you spent talking with Detective Nievas, a short amount of time or a long amount of time?

MR. MCCARTHY: Objection.

THE COURT: Yes, sustained. You have to ask something else.

. . . . .

Q. After it was read to you did you tell Detective Nievas that anything in that—was there any information that was missing from the statement?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

Q. Did you tell Detective Nievas that you had left out certain facts?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

Q. Did you tell Detective Nievas that she had missed certain facts in the translating and writing of that statement?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

Q. When you were read the statement did you tell Detective Nievas that you thought she had left out any specific information?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

(Tr. 505–06, 508–09).

With respect to the third area of inquiry, Taveras testified on cross-examination that she and Glisson did not like each other. (*Id.* at 547). Indeed, she said that she disliked him because of "his look" and because "he's a rapist" who "likes to rape little girls and get involved with women." (*Id.* at 547–48). Despite these strong opinions, Taveras testified that she was not angry with Glisson, but, instead, felt pity for his pregnant wife, Teisha Morales, and

the girls. (*Id.* at 548). Defense counsel then continued his questioning as follows:

Q. So, you're angry at Eric for double timing you and going out with Teisha Morales, correct?

MR. MCCARTHY: Objection to form, please.

THE COURT: Sustained.

Q. Teisha came over to you and she told you that she was pregnant, pregnant by Eric, right?

MR. MCCARTHY: Objection, Judge.

THE COURT: Sustained.

Q. And when Teisha spoke to you, because she's your friend, you got angry at Eric after finding out information that Teisha gave you, right?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

. . . . .

Q. And you were angry at Eric, right?

THE COURT: Asked and answered. Sustained.

A. No.

Q. What date did you speak to his wife about this abuse that he, you say he committed against you?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

Q. Do you recall what date you spoke to his wife about this matter?

MR. MCCARTHY: Same objection.

THE COURT: Sustained.

Q. Isn't it true that you spoke to Teisha Morales about this abuse sometime around the end of January, beginning of February 1995?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

. . . . .

Q. Now, Miss Taveras, do you know when Teisha Morales gave birth?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

Q. You were friends with Teisha Morales, correct?

MR. MCCARTHY: Objection.

THE COURT: I'm going to sustain the objection.

Q. And you're still angry at Eric because you feel that he did wrong to Teisha Morales and yourself, correct?

MR. MCCARTHY: Objection.

THE COURT: Sustained.

(*Id.* at 549, 563).

2. *Co-defendant's Confession*

Glisson's accomplice Cosme was arrested on February 3, 1995, followed a short while later by Glisson. (*Id.* at 645–46; 651–52). After Glisson's arrest, he was placed in a holding cell in the 43rd Precinct. (*Id.* at 775). In a nearby interview room, the police were continuing their interrogation of Cosme. (*Id.* at 774). Detective Michael Donnelly testified that at approximately 11:30 p.m., Cosme yelled, "Yeah right, I did that motherfucker," to which Glisson, who was apparently within earshot, responded, in substance, "Yo, Mike, shut up, they ain't got shit." (*Id.* at 776).[5]

Prior to Detective Donnelly's testimony, Justice Straus informed counsel that he intended to give the jury a limiting instruction regarding Cosme's statement. (*Id.* at 667). Although Glisson's attorney argued that the proposed instruction did not eliminate a *Bruton* problem arising from the

**5.** Before this exchange, neither Cosme nor Glisson had been told that the other was in custody. (*Id.*).

statement, Justice Straus disagreed, stating: "[T]here's no *Bruton* problem because there's no statement ... of Cosme that implicates your client. It's your client's own statement." (*Id.* at 670).

Immediately after Detective Donnelly testified about the statements uttered by Cosme and Glisson, Justice Straus gave the jury the following instruction:

> ... With regard to the statement attributed to Cosme, you're not to consider the testimony of Detective Donnelly with respect to the words attributed to Michael Cosme for the truth of that statement attributed to Cosme. They—those words were not offered to you by the People for their truth, but merely as words allegedly spoke at that particular time, and they were offered to explain or to complete the sequence of events or the narrative of events and to provide a context in which defendant Glisson's statement was purportedly made.
>
> . . . . .
>
> So that the first instruction is with regard to the words attributed to Cosme. They're not offered for the truth of their content, they're offered as words spoken at the time to complete the narrative or to provide with you the context of events.

(*Id.* at 777–778). The court repeated this instruction in its final charge. (Resp't's Br. at 45).[6]

3. *Uncharged Drug Crimes*

During his testimony, Lieutenant Sean O'Toole was asked to describe the condition of the apartment where Glisson was arrested. (Tr. 652). He testified that "[t]here was garbage strewn all over the apartment, crack vials, marijuana, bags in the apartment." (*Id.*). The court then held an off-the-record sidebar conference, after which the jury was given the following curative instruction before testimony resumed:

> Okay. Members of the jury, we discussed a matter involving the evidentiary rules at the bench. The objection is sustained in that any testimony just now [given] by Lieutenant O'Toole concerning the, any particular items observed in this particular apartment is stricken. You're to disregard any reference to those items, it's not part of this case.

(*Id.* at 653).

During the next recess, defense counsel requested a mistrial on the basis of the stricken testimony. (*Id.* at 660). After hearing from both sides, Justice Straus denied that application, observing:

> ... I think what was done, it was the best thing to be done which was to sustain your objection, strike that particular aspect of his testimony where he, in describing the apartment added testimony concerning marijuana and crack vials, and direct the jury to disregard it.
>
> . . . . .
>
> I don't think—I don't think it's of great consequence when taken in context, but obviously it should have been stricken, it should not have been part of his testimony. And I believe the action I took is curative of the earlier testimony, so we'll have to proceed from that point.

(*Id.* at 663–64).

4. *Brady Violations*

a. *Bullets*

Detective Donnelly was present at the Diop autopsy. (*Id.* at 945). Both he and a

---

**6.** The parties have not furnished the Court with any portion of the trial transcript beyond the close of Glisson's defense case. Also missing from the record is the transcript of the pretrial hearings. Despite these gaps, the transcript portions that have been provided, supplemented by the state court briefs on appeal, are sufficient to resolve the issues raised in this proceeding.

police ballistics expert testified that one of the two bullets recovered from Diop's body was blue, and the other lead or grey colored. (*Id.* at 945–46, 1033). Dovetailing with this testimony, defense witness Tolentino testified about a stationhouse interview with Detective Donnelly, during which Tolentino had indicated that some of the bullets in the gun he allegedly used to murder Diop were blue. (*Id.* at 1205). Because the bullets retrieved during the autopsy were stolen during an earlier trial, (*see* Resp't's Br. at 50), and therefore unavailable to the defense, Glisson's counsel requested an adverse inference charge which was denied. (*Id.*). Glisson now claims that the absence of the bullets constitutes a *Brady* violation. (Am. Pet. at 10–13).

### b. *Phone Records*

During his cross-examination, Detective Donnelly was asked if he had subpoenaed the toll records for the cellular phone stolen from Diop's livery car. (Tr. 817). The detective testified that he had reviewed records subpoenaed by the District Attorney's office which indicated that the cellular phone had been used subsequent to the murder, but was unable to recall when it was used or who was called. (*Id.*).

The next day, defense counsel argued that the phone records should have been produced as *Brady* material because they did not reflect any calls to Glisson's friends or family. (*Id.* at 850). The court rejected that contention, as well as a request for sanctions, on the basis that the telephone records did not tend to exculpate Glisson. (*Id.* at 851).

### 5. *Suppression of Glisson's Statement*

Prior to trial, Justice Straus held a *Huntley* hearing [7] to determine the admis-

sibility of the statement made by Glisson in response to Cosme's statement. Although the transcript of the hearing is unavailable, *see* n. 5 *supra*, the state appellate briefs establish that the critical issues were whether Glisson was unlawfully arrested inside his home without a warrant and whether he was given *Miranda* warnings. (Def.'s Br. at 36–38; Resp't's Br. at 29–32). In that regard, Glisson testified that he had been living in an apartment at 1710 Lafayette Avenue, the location where he was arrested, for a period of four months, paying a rent of $100 per week. (Def.'s Br. at 6). He also claimed that his signature on a *Miranda* acknowledgment form was forged. (Resp't's Br. at 10). The Criminal Justice Agency sheet prepared after Glisson's arrest indicated, however, that he lived at 1711 Lafayette Street. (*Id.*).

Following the hearing, the trial court issued a written decision denying Glisson's motion. (Def.'s Br. at 8). The court found that Glisson's representation that the apartment where he was arrested was his home was not credible. *Glisson,* 689 N.Y.S.2d at 39.

### 6. *Weight and Sufficiency of Evidence*

In his final ground for relief, Glisson attacks the reliability of Taveras and points to the confession of Tolentino in an effort to establish that his conviction was contrary to the weight and sufficiency of the evidence. (Am. Pet. at 18–27). Among other things, Glisson alleges that Taveras' testimony that she was "angry" with Glisson and thought he was a rapist and child molester demonstrates her bias and motivation to lie. (*Id.* at 18). He further contends that Taveras' use of marijuana on frequent occasions, including the day of the murder, affected her ability to perceive the events about which she testi-

---

**7.** *See People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

fied. (*Id.* at 18–19). Glisson also points to alleged inconsistencies in Taveras' testimony, regarding such matters as the time of the incident and where she was when she first observed the cab, arguing that they render her testimony less credible than that given by Tolentino. (*Id.* at 19, 26–27).

### III. *Discussion*

#### A. *Standard of Review*

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court. *Herrera v. Collins,* 506 U.S. 390, 401, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Rather, a state prisoner seeking habeas relief under Section 2254 must show by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides, in part, that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was *contrary to,* or involved an *unreasonable application of,* clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1)(emphasis added).

As the Second Circuit noted in *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000), the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.,* 529 U.S. at 409. This standard does not require that all reasonable jurists agree that the state court was wrong. *Id.,* 529 U.S. at 409–10. Rather, the standard "falls somewhere between 'merely erroneous and *unreasonable* to all reasonable jurists.'" *Stinson,* 229 F.3d. at 119 (quoting *Francis S. v. Stone,* 221 F.3d 100, 109 (2d Cir.2000))(emphasis added). Section 2254(d)(1) only applies, however, "with respect to claims adjudicated on the merits in state court." *Williams,* 529 U.S. at 412.

Section 2254(d)(2) further authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and that "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody ... violates the Constitution, that independent judgment should

prevail." *Williams*, 529 U.S. at 389. As discussed below, however, Glisson has failed to show that his conviction resulted from such constitutionally infirm proceedings in state court, and he therefore is not entitled to federal habeas relief.

### B. *Limitations Period*

■ Pursuant to AEDPA, an inmate ordinarily must file a habeas corpus petition within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). As of the date that Glisson asked to withdraw his petition, the Second Circuit had concluded that AEDPA's tolling provision, 28 U.S.C. § 2244(d)(2), required the one-year limitations period to be tolled during the pendency of a habeas petition in federal court. *Walker v. Artuz*, 208 F.3d 357, 360 (2d Cir.2000). Thereafter, however, the Supreme Court reversed *Walker*, holding that a pending federal habeas petition does not toll the one-year limitations period. *Duncan v. Walker*, 533 U.S. 167, 181–82, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001).

In this case, if *Duncan* were to be applied strictly, Glisson would be penalized for recognizing the need to pursue exhaustion while a more lethargic petitioner, who failed to recognize the "mixed" nature of his petition, might have the benefit of the Second Circuit's decision in *Zarvela v. Artuz*, 254 F.3d 374, 380 (2d Cir.2001), which recommends that the petition of a state prisoner facing a potential AEDPA time bar should be stayed, with only the unexhausted claims dismissed, so that exhaustion can be pursued without adverse consequences.

Here, of course, Glisson did not take any further steps to exhaust his unexhausted claims. His failure to do so, however, should not prejudice his ability to present his previously exhausted claims. Accordingly, Glisson's original petition should be reinstated.

### C. *Procedurally Defaulted Claims*

Under settled Supreme Court precedent, a federal court may not consider an issue of federal law raised in a state prisoner's petition for a writ of habeas corpus if the state court's prior denial of that claim rested on an adequate and independent state ground. *See, e.g., Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A finding of procedural default qualifies as such an adequate and independent state ground, *Harris*, 489 U.S. at 262, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or ... that failure to consider the claims will result in a fundamental miscarriage of justice." *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir.1996)(quoting *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). *Accord Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir.2000).

To demonstrate cause, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Gonzalez v. Sullivan*, 934 F.2d 419, 422 (2d Cir.1991)(quoting *Murray* ). The circumstances which may constitute cause include: (1) interference by government officials making compliance impracticable; (2) situations in which the factual or legal basis for a claim was not reasonably available to counsel; and (3) ineffective assistance of counsel. *See Murray*, 477 U.S. at 488; *Bossett v.*

*Walker,* 41 F.3d 825, 829 (2d Cir.1994)(quoting *Murray* ).

A showing of prejudice requires a petitioner to demonstrate that failure to raise the claim previously had a substantial injurious effect on his case such that he was denied fundamental fairness. *Reyes v. State,* 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999).

Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent." *Aparicio v. Artuz,* 269 F.3d 78, 90 (2d Cir.2001).

Here, the Appellate Division found that Glisson's claim concerning his counsel's cross-examination of Taveras was not preserved and "decline[d] to review [it] in the interest of justice." *Glisson,* 689 N.Y.S.2d at 39. The Appellate Division further observed, however, that it would have rejected the claim had it reached it because the trial court "accorded ample scope of cross-examination on this subject." *Id.*

The failure of Glisson's counsel to comply with New York's contemporaneous objection rule, Crim. Proc. L. § 470.05(2), constitutes an adequate and independent state procedural ground for the denial of his cross-examination claim. *Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990); *Taylor v. Harris,* 640 F.2d 1, 2 (2d Cir. 1981). Accordingly, because Glisson has established neither cause for his procedural default nor that he is actually innocent, this Court lacks jurisdiction to entertain this claim. This jurisdictional bar applies even though the Appellate Division ruled in the alternative on the merits of the claim. *See Glenn,* 98 F.3d at 724; *Velasquez,* 898 F.2d at 9.

### D. *Unexhausted Claims*

Pursuant to 28 U.S.C. §§ 2254(b)(1)(A) and (B), a habeas petition brought by a state prisoner may not be granted unless the petitioner has exhausted all of the remedies available to him through the state courts, *or* there is no state corrective process available to the petitioner, *or* circumstances render that process ineffective to protect the petitioner's rights. As a defendant charged with a crime in New York State, Glisson unquestionably had an effective process available to him through the state statutes governing appeals in criminal cases. *See* Crim. Proc. L. § 450.10. Therefore, to satisfy the exhaustion requirement with respect to a particular federal claim, Glisson must show that he presented the substance of "the same federal constitutional claim[ ] that he now urges upon the federal courts to the highest court in the . . . state." *Aparicio,* 269 F.3d at 89–90 (internal citations and quotation marks omitted).

"A federal constitutional claim has not been fairly presented to the [s]tate courts unless the petitioner has informed those courts of 'all of the essential factual allegations' and 'essentially the same legal doctrine he asserts in his federal petition.'" *Strogov v. Attorney Gen. of N.Y.,* 191 F.3d 188, 191 (2d Cir.1999)(quoting *Daye v. Attorney Gen. of N.Y.,* 696 F.2d 186, 191–92 (2d Cir.1982)). To meet this requirement, it is not necessary that the federal constitutional claim be presented to the state courts in *haec verba;* rather, there are a number of ways in which a petitioner may present such a claim, including

(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is

well within the mainstream of constitutional litigation.

*Daye,* 696 F.2d at 194.

#### 1. *Opening Statement*

■ In his first ground for relief, Glisson alleges that the trial court improperly curtailed his counsel's opening statement. (Am. Pet. at 3). In his direct appeal, however, Glisson made no mention of any federal constitutional right, nor did he cite to any specific provision of the United States Constitution, in the course of discussing his claim.

Thereafter, although Glisson sought to have his petition dismissed so that he could exhaust this claim, he apparently never did so. In an effort to overcome this lapse on his part, Glisson now argues in his petition to reopen that his citation to *People v. Crimmins,* 36 N.Y.2d 230, 367 N.Y.S.2d 213, 326 N.E.2d 787, "was sufficient enough to put the court on notice that they were to entertain a constitutional claim," that there is no need to "cite chapter and verse of [h]ornbook [l]aw," and, in the alternative, that the Court should stay this proceeding pursuant to *Zarvela* if it concludes that the claim is unexhausted. (Petition to Reopen, dated Nov. 11, 2001, ¶ 8).

The *Crimmins* case, which arose out of the highly-publicized trial of a mother on charges related to the deaths of her children, did not concern the proper scope of an opening statement. Indeed, the decision was cited in Glisson's Appellate Division brief simply to set forth the harmless error standard in New York courts. (*See* Def.'s Br. at 29). Consequently, because Glisson's brief on appeal gave the Appellate Division no inkling that a federal constitutional claim was being asserted, Glisson did not properly exhaust his "opening statement" claim, as his motion to dismiss his original petition impliedly acknowledged. Indeed, even at this late stage, Glisson apparently has not taken any steps to exhaust this claim. In these circumstances, Glisson is not entitled to a stay of further proceedings so that he can pursue exhaustion. His opening statement claim should consequently be dismissed for want of exhaustion.[8]

#### 2. *Uncharged Drug Crimes*

■ The other allegedly unexhausted claim relates to the introduction of the evidence (which was later stricken) concerning narcotics and narcotics paraphernalia in the apartment where Glisson was arrested. In his Appellate Division brief, Glisson cited *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), in the course of arguing that this evidence of uncharged crimes should not

---

8. There also would be no point to permitting Glisson to return to state court at this juncture. His claim would be barred from collateral review because it could have been raised on direct review. *See* Crim. Proc. L. § 460.20; 22 N.Y. C.R.R. § 500.10(a).

Furthermore, even if his opening statement claim were properly before this Court, it would not provide a basis to issue a habeas writ. "An opening statement has a narrow purpose and scope. It is to state what evidence will be presented ...; it is not an occasion for argument." *United States v. Dinitz,* 424 U.S. 600, 612, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)(Burger, J., concurring).

More importantly, "an opening statement by the defendant is not ... a guaranteed right, and ... the making and timing of opening statements can be left constitutionally to the informed discretion of the trial judge." *Elmore v. Henderson,* 1989 WL 88719, at *5 (S.D.N.Y. July 28, 1989)(quoting *United States v. Salovitz,* 701 F.2d 17, 21 (2d Cir.1973)). Here, Justice Straus permitted Glisson's attorney to make an opening statement which was restricted only when counsel engaged in argument and sought to discuss evidence which had not yet been found admissible. These rulings did not deprive Glisson of any constitutional rights.

have been admitted. Although *Bruton* principally concerns a defendant's right to confrontation when the prosecution seeks to introduce a co-defendant's confession, Glisson cited the case in his brief for the principle that limiting instructions may sometimes be insufficient to guard against prejudice. (Def.'s Br. at 30). While this reference is not directly on point, it does suggest that Glisson was seeking to present a federal constitutional claim which, out of an excess of caution, should be addressed in this proceeding.

### E. Merits

#### 1. Right to Confront Accusers

In his petition, Glisson alleges that Justice Straus improperly limited his counsel's cross-examination of Taveras in violation of his constitutional right to confront his accusers. (Am Pet. at 3–6). Pursuant to the Confrontation Clause of the Sixth Amendment, a defendant has a right to cross-examine the witnesses testifying against him to expose any possible biases or motives for testifying. *Delaware v. Van Arsdall,* 475 U.S. 673, 678–80, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). This right is not absolute, and "trial judges retain wide latitude ... to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679; *see also United States v. Holmes,* 44 F.3d 1150, 1157 (2d Cir.1995)(court "retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence"). Furthermore, even where a Confrontation Clause violation has occurred, relief need not be granted if the error constitutes only harmless error. *Fuller v. Gorczyk,* 273 F.3d 212, 220 (2d Cir.2001); *Henry v. Speckard,* 22 F.3d 1209, 1215 (2d Cir.1994).

In his petition, Glisson claims that defense counsel was (a) "barred from eliciting whether there was a (male) or (female) translator" that took notes and recorded Taveras' statement; (b) prevented from determining the duration of her interview and when her statement was recorded; and (c) prohibited from exposing Taveras' bias towards Glisson. (Am. Pet. at 4–5). In the course of a cross-examination which fills more than 200 pages of the trial transcript, however, Taveras was thoroughly questioned by both Glisson's and Watkins' counsel. (*See* Tr. 347–564, 581–89). Among other things, defense counsel established that Taveras was uncertain of the precise time of the shooting, (*id.* at 353–55), where she was when she first saw the livery car, (*id.* at 379–81), whether the car's windows were tinted, (*id.* at 385), and whether the car that she first observed was the one whose driver was shot (*id.* at 391). Counsel also established that Taveras had been using marijuana for fourteen years, (*id.* at 402), including, in all likelihood, the day of the incident, (*id.* at 406–07), that she believed marijuana had no effect on her ability to perceive events, (*id.* at 409), that she told a neighbor that she had not witnessed the shooting, (*id.* at 411), that her prior statement to the police and prior sworn testimony contradicted her trial testimony that she saw the first shot being fired, (*id.* at 423, 432, 460–62), and that her prior testimony contradicted her trial testimony regarding Watkins' location in the car and the amount of time that elapsed between the two shots (*id.* at 446–47, 516–18). Glisson's counsel also elicited testimony that Taveras did not like Glisson because she considered him a "rapist" who "likes to rape little girls and get involved with women." (*Id.* at 547–48). Although she denied that it was a factor in

her anger, Taveras also conceded that Glisson had tried to abuse her, (*id.* at 548, 1550), and had bothered her shortly after Diop was killed (*id.* at 564).

In light of this extensive cross-examination, the trial judge's decision to limit further questioning of Taveras in an effort to move the trial along was not an abuse of his considerable discretion. Moreover, even if the relatively few questions cited by Glisson as the basis for his Confrontation Clause claim should have been answered, Justice Straus' failure to permit them clearly was harmless since they did not go to the merits and any further impeachment material plainly would have been cumulative.

### 2. Cosme's Confession

In *Bruton*, the Supreme Court held that a defendant's confession implicating a co-defendant may not be admitted at their joint trial because the resulting Confrontation Clause violation cannot adequately be cured by a limiting instruction. *Bruton*, 391 U.S. at 126. Thereafter, in *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), *Bruton* was limited to situations in which the defendant's confession "expressly implicated" the co-defendant as an accomplice. Thus, the *Bruton* rule is inapplicable when "the confession [is] not incriminating on its face, and [becomes] so only when linked with evidence introduced later at trial," such as the defendant's own testimony. *Id.*

In this case, Cosme's statement admitting his role in the crime ("Yeah, right, I did that motherfucker") in no way implicates Glisson. Indeed, Cosme's statement to the police only becomes incriminating when it is paired with Glisson's unsolicited response ("Yo, Mike, shut up, they ain't got shit."). There consequently was no *Bruton* violation at trial. Furthermore, Justice Straus properly instructed the jury

both immediately after Detective Donnelly's testimony and in his final charge that Cosme's statement had not been offered for its truth, but solely to explain Glisson's own outburst. (Tr. 777–778, Resp't's Br. at 45). This careful instruction eliminated any unfair prejudice that conceivably might have resulted from the admission of Cosme's statement.

### 3. Uncharged Drug Crimes

Courts "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it." *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). Such a presumption is rebutted only if the defendant can show an overwhelming probability that the jury was unable to follow the instruction and that the evidence was likely to be "devastating." *Id.* Glisson cannot meet this heavy burden. In the first place, Lieutenant O'Toole's testimony with respect to uncharged drug crimes consisted of one short sentence indicating that "[t]here was garbage strewn all over the apartment, crack vials, marijuana, bags in the apartment." (Tr. 652). This statement did not directly implicate Glisson in any narcotics crime. In addition, after the testimony was adduced, the trial court gave a prompt curative instruction requiring the jury to disregard any reference to items that were in the apartment at the time of Glisson's arrest. Given the limited probative value of the testimony, and the immediate instruction to disregard it, Glisson cannot establish that he was prejudiced or that his request for a mistrial was improperly denied. *See, e.g., Dickens v. Herbert*, 2002 WL 1728514, *5 (S.D.N.Y. July 25, 2002)(testimony of uncharged crimes could not serve as basis for granting mistrial where the spontaneous utterance occupied a single line of transcript and trial court promptly struck the

testimony and instructed jury to disregard it); *Roldan v. Artuz*, 78 F.Supp.2d 260, 280 (S.D.N.Y.2000)("even if the testimony amounted to inadmissible evidence of uncharged crimes, the trial court's prompt curative instructions to the jury eliminated the risk of unfair prejudice").

### 4. *Brady Violations*

Under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution must, upon request, disclose evidence favorable to the defendant which is material to either guilt or punishment. This includes both exculpatory material and material which might be used to impeach the credibility of a prosecution witness. *United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996). However, the time when such *Brady* material must be disclosed to the defense remains an unsettled issue. *See generally* Jay Goldberg, *Why the Southern and Eastern Districts Should Adopt a 'Brady' Rule*, N.Y. Law J., June 16, 2003, at 4.

To establish a *Brady* violation, a petitioner must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481, (1985). A petitioner must show that (a) the evidence was favorable to the accused, either because it was exculpatory or impeaching; (b) the evidence was suppressed, either willfully or inadvertently, by the prosecution; and (c) the omission caused prejudice. *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

Glisson's first *Brady* claim is that the trial court erred by denying his request for an adverse inference charge with respect to the bullets recovered from Diop's body. Those bullets evidently were unavailable by the time of Glisson's trial because they were stolen during a prior proceeding. (*See* Resp't's Br. at 50).

The fact that at least one of the bullets was blue could conceivably be considered exculpatory since it lent credibility to Tolentino's testimony that he had killed Diop using a gun containing blue bullets. (*See* Tr. 1205). However, the color of the bullets retrieved during the autopsy was known to the defense prior to trial. Moreover, this fact appears to have been uncontested. It follows that neither the presence of the bullets at trial, nor any judicial comment concerning their absence, would have been likely to affect the outcome of the trial. This aspect of Glisson's *Brady* claim is therefore meritless.

Turning to the telephone records, Justice Straus held that information concerning the calls to and from Diop's cellular phone was not *Brady* material because it did not tend to exculpate Glisson in this murder case. (*Id.* at 851). This ruling was plainly correct. In any event, even if the phone records could be considered exculpatory, they clearly were turned over to the defense during the course of the trial. (*See id.* at 842). Since Glisson has not shown that he could have made any greater use of them had they been turned over earlier, he has not established any prejudice, and therefore cannot obtain any relief on the basis of this alleged *Brady* violation.

### 5. *Suppression of Glisson's Statement*

Glisson's next claim is that he was arrested without a warrant in his home and that his subsequent stationhouse statement should therefore have been suppressed pursuant to *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). (Am. Pet. at 15–17). "[F]ederal habeas corpus relief is not available on the ground that evidence produced at trial was the result of an unconstitutional search and seizure, unless the state denied

the prisoner an opportunity for full and fair litigation of the claim." *Grey v. Hoke,* 933 F.2d 117, 121 (2d Cir.1991)(citing *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)). Thus, a Fourth Amendment claim can be considered on habeas review only when (a) the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) there is a corrective mechanism, but the defendant was unable to use it because of an "unconscionable breakdown in the underlying process." *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992)(citing *Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir.1977)).

The State of New York clearly has provided defendants such as Glisson with the necessary corrective procedures through Crim. Proc. L. § 710. *See Vega v. Artuz,* 2002 WL 252764, at *12 (S.D.N.Y. Feb. 20, 2002); *Capellan,* 975 F.2d at 70 n. 1 ("federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y.Crim. Proc. Law § 710.10 *et seq.* (McKinney 1984 & Supp. 1988), as being facially adequate" (quoting *Holmes v. Scully,* 706 F.Supp. 195, 201 (E.D.N.Y.1989))). Therefore, in order to secure habeas relief, Glisson must demonstrate that there was a breakdown in the state process—which typically consists of some sort of "disruption or obstruction of a state proceeding." *Capellan,* 975 F.2d at 70 (quoting *Shaw v. Scully,* 654 F.Supp. 859, 864 (S.D.N.Y.1987)). Glisson has made no such showing here. Accordingly, because Glisson was given a full and fair opportunity to litigate his Fourth Amendment claims prior to trial, his claim concerning his stationhouse statement cannot be entertained.

### 6. *Weight and Sufficiency of the Evidence*

Glisson's final claim is that his conviction was contrary to the weight and sufficiency of the evidence. (Am. Pet. at 18–27).

A petitioner's claim that his conviction was contrary to the weight of the evidence is not cognizable on federal habeas review. *See Givens v. Burge,* 2003 WL 1563775, at *10 (S.D.N.Y. Mar. 4, 2003)(collecting cases). On the other hand, the sufficiency of the evidence used to convict a defendant is within a habeas court's purview. A habeas petitioner challenging the sufficiency of the evidence nevertheless bears a "very heavy burden." *Knapp v. Leonardo,* 46 F.3d 170, 178 (2d Cir.1995) (internal quotation marks omitted). To prevail, the petitioner must show that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Bossett,* 41 F.3d at 830 (quoting *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Moreover, in considering such a sufficiency claim, a habeas court must weigh the evidence in the light most favorable to the prosecution and draw all permissible inferences in its favor. *Jackson,* 443 U.S. at 326. A sufficiency claim therefore does not permit the reviewing court to redetermine the credibility or reliability of witnesses or substitute its view of the evidence for that of the trier of fact. *See Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996). Rather, insofar as there is evidence from which the jury could have drawn an inference favorable to the accused but chose not to, the court must "defer to . . . the jury's choice of the competing inferences." *United States v. Kinney,* 211 F.3d 13, 18 (2d Cir.2000)(quoting *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998)). For this reason, "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." *United States v. Danzey,* 594 F.2d 905, 916 (2d Cir.1979). *See also Ed-*

*wards v. Jones,* 720 F.2d 751, 755 (2d Cir.1983)(following *Danzey* even though the testimony and character of the sole witness who directly implicated the petitioner were "less than inspiring"); *Means v. Barkley,* 2000 WL 5020, at *4 (S.D.N.Y. Jan.4, 2000)(applying *Danzey* and noting that habeas court may set aside conviction only if testimony is "incredible as a matter of law").

Here, the trial jury had to resolve inconsistencies between the case presented by the prosecution and Tolentino's claim that he shot Diop. To be sure, both Taveras' testimony and that offered by Tolentino was far from overwhelming. Nevertheless, Taveras' testimony was sufficient to establish Glisson's guilt. The jury's decision to credit the testimony of Taveras, rather than that given by Tolentino, is precisely the sort of determination that a federal habeas court may not second guess. Glisson's claim that the evidence was insufficient to sustain his conviction consequently must be denied.

## IV. *Conclusion*

For the foregoing reasons, Glisson's petition should be dismissed. Furthermore, because Glisson has not made a substantial showing of the denial of a constitutional right, as required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not be issued.

## V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Victor Marrero, at the United States Courthouse, 40 Centre Street, New York, N.Y. 10007, to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Marrero. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).

July 2, 2003.